## Worman *et al. versus* Kramer.

1. A sale of goods in the hands of a bailee is good against an execution-
creditor, if the vendor do not retake possession.

2. Kramer bought an omnibus and horses from Berkenstock, whom he
immediately employed as driver; the horses were kept at the stable of a
third person.   *Held*, that this was not *per se* fraud, if the stock was really
kept by the bailee in an open and notorious manner, and this was for the
jury.

3. The court charged, " a concurrent possession exists only where the per-
son in actual possession has some interest in it as part owner."   *Held* to be
error.

4. Where the control and use of goods by vendor and vendee are so con-
fused and mixed, as to leave the question of possession uncertain, the sale
however honest, cannot be sustained.

5. A constable levied on horses, &c., of a vendee for the debt of the vendor ;
he offered to return one horse as taken in mistake, and it was refused unless
with the return of all.   He returned the horse to the stable whence he had
taken it.   *Held*, that this was evidence in mitigation of damages.

6. The horse being offered back in a reasonable time in good plight, it
was the duty of the vendee to receive him.

March 19th 1873.   Before READ, C. J., AGNEW, SHARSWOOD
and MERCUR, JJ.   WILLIAMS, J., at Nisi Prius.

Error to the Court of Common Pleas of *Lehigh county*: No.
97, to July Term 1872.

This was an action of trespass d. b. a., brought August 17th
1870, by Robert D. Kramer against Abraham Worman, Walter
J. Grim, George Steininger and Peter Dorney.   The goods taken
were an omnibus, horses, harness, &c., which were seized and sold
by Worman, constable, as the property of one Harrison Berken-

[Worman *v.* Kramer.]

stock under executions against him at the suit of the other defendants.

The plaintiff testified that he kept the "Allen House" in Allentown in 1870, and that he bought an omnibus, a pair of horses and double set of horses from Berkenstock, and gave him his note for $500, payable in twelve months; he got them on Saturday in front of his house, where he took possession; and on the following Monday he ran them from his hotel to the depot; he kept them at the stable of Keim & Einstein, he put them there the same day he bought them; that firm agreed with him to furnish hay for the horses and keep the omnibus at $1.50 per week. He hired Berkenstock to drive for him at $50 per month; the coach was brought directly from the coach-making shop to his house; he bought another horse from George Snyder afterwards which had never belonged to Berkenstock, but was driven to the omnibus; the three horses, omnibus and harness were levied on by Worman in June 1870. Berkenstock, shortly before the sale to plaintiff, told him that he, Berkenstock, had been running a coach for Levi Hottenstein at "The Eagle;" that he had sold a coach to Hottenstein and agreed with him not to run an opposition, and wished plaintiff or his brother to run one in plaintiff's or his brother's name; plaintiff said he would not have anything to do with it in that way; plaintiff bought the concern out and out, and told Berkenstock to take it to Keim & Einstein's stable. Berkenstock was to employ the boy to assist him for the $50 per month, and plaintiff to board the boy. Berkenstock kept an account of the receipts; out of them he paid for the feed, &c., and kept the balance for his salary; plaintiff's name was on the coach; the driver was forbidden to carry passengers to any other hotel than the plaintiff's. Berkenstock had no interest in the coach or horses; Berkenstock continued in plaintiff's employ after the constable's sale, running a carriage from his hotel to the depot. Plaintiff never got any of the property after it was seized, he demanded it twice in writing.

Berkenstock testified that in April 1870, he owned four horses and two coaches; he sold two horses, coach and double set of harness to the plaintiff; he further testified, much as plaintiff did, as to his wishing plaintiff to run it for witness and his afterwards buying it; and as to his own and the boy's wages, &c. Witness never told plaintiff that he was indebted; the coach was run only from "The Allen House" and "The Fountain House;" witness paid for keeping the horses so long as there was anything from the earnings, and plaintiff paid the rest and the smith's bills and revenue taxes.

Worman testified that he was indemnified by the other defendants, plaintiffs in the executions.

There was evidence also that the plaintiff paid the note which he had given to Berkenstock for the property.

The defendants gave evidence to show that the sale to the plaintiffs was colorable and fraudulent; that the possession had never been changed from Berkenstock or that he had at least a concurrent possession with the plaintiff.

Worman, defendant, testified that after he had made the levy, he took the property to "The La Fayette House;" shortly after he got there, Walter Kramer, brother of the plaintiff, gave witness notice to bring back everything he had taken away. "I told him I would return the brown mare (that purchased from Snyder); he said if I did not return all they would take none. I saw R. D. Kramer (plaintiff) a day or two afterwards, and he told me he would let me see for moving his property, then I told him I would be willing yet to give up the mare; he said if I would not return everything he would not take the mare; after the sale I brought back to the place where I took them from, the brown mare, bobtail horse, and one set of double harness, and one set single harness, and then I saw Berkenstock and Kramer together at the Allen House porch; I gave them notice that I had returned the goods, naming them; they said they wouldn't receive them; it was thirteen to fourteen days from time of levy until return of the goods."

The plaintiff in rebuttal testified that he had never removed any of the property levied on.

The defendants submitted these points:—

2. If the property mentioned in the first point was capable of immediate and manual delivery it is not sufficient for the plaintiff to take merely constructive possession, and his failure to take actual, visible and continued possession of the same is a fraud in law, and renders the alleged sale void as to the creditors of Berkenstock, and the plaintiff cannot recover as to said goods.

3. As H. Berkenstock continued in visible possession of the property mentioned in the first point, the allegation that he was the servant of R. D. Kramer cannot avail the plaintiff, "for this would be a secret trust, contrary to the visible ownership and possession;" "there cannot, in such case, be a concurrent possession; it must be exclusive, or it would, by the policy of the law, be deemed colorable."

4. The allegation by the plaintiff that H. Berkenstock was his servant, and in that capacity had possession of the property mentioned in the first point, obliges the plaintiff to remove all doubt and color of fraud from the alleged transfer, and if he fail to do that, then he cannot recover for the same.

6. If the jury believe, from the evidence, that the sale was made by Berkenstock for the purpose of hindering, delaying or defrauding his creditors, and that Kramer, the plaintiff, paid no

[Worman *v.* Kramer.]

money, but gave his note which was not legally negotiated, then Kramer was not such a purchaser under all the circumstances as the law would protect against Berkenstock's execution-creditors; and the alleged subsequent payment of said note by Kramer will not entitle him to recover on this point.

9. If the jury find that the mare was offered back to Kramer by the defendants, or any of them, as soon as they had ascertained the fact that she had been bought from G. Snyder by R. D. Kramer, and he refused to accept her, and that she was not sold under the constable's levy, but was offered to Kramer again after the constable's sale, in as good a condition as she was before the levy, and was again refused when so offered; that the mare was then taken to the stables of the Exchange Hotel, where she had been kept and boarded before the levy was made by the constable and left there subject to the plaintiff's order, then he cannot recover any damages on account of the subsequent sale of her for feed.

The court declined to answer the points, except as they were answered in the general charge.

The court amongst other things charged :—

" The defendants allege that the sale was fraudulent in law as well as fraudulent in fact.

" A fraud in law arises where a sale takes place and there is no actual delivery of things sold to the vendee, but the vendor is permitted to retain the possession. A fraud in law is usually declared to be such by the court, when the evidence is of such a character as to require no fact in relation to the delivery to be found by the jury. In this case there are certain facts to be found by you before a fraud in law shall arise.

" Whenever an honest, bonâ fide sale takes place, the vendor must give the vendee such a possession as the nature of the property sold will best admit of, and if the property be capable of it, the transfer of possession should be actual, open, notorious and visible.

" [If you find that Mr. Kramer was an actual purchaser without actual fraud, or fraud in fact, and that at the time he purchased he ordered the omnibus and the horses to the Exchange stables, with the directions to the keepers of those stables that the horses should be kept at his own charges, and that in addition thereto, he had his name inscribed upon the coach, and that all the bills, which were incurred in the running of the coach, were contracted in the name of Mr. Kramer, and as his debt, and that the line was held out to the world generally as his property, then he did all that the law required of him to do as regards a transfer or a change of the possession.]

" If you find that there was such an open, visible and notorious transfer of the possession accompanying this alleged sale, then I

say to you that the transaction is not a legal fraud; and the employment of Berkenstock as the driver of the line, under such circumstances, did not of itself render the sale a fraud in law. If, however, you find that Berkenstock was a part owner, and as such part owner that he held concurrent possession with Kramer, then the sale would be a fraud in law, because there would be no transfer of the entire possession to Kramer.

" [A concurrent possession exists only where the person in actual possession of the property has some interest in it as a part owner. As to whether there was such a part ownership in Berkenstock, is a question of fact to be found from all the evidence in the cause.]

" If then you find that there was a transfer of the possession, and no concurrent possession in Berkenstock as part owner, the plaintiff's case thus far will be such as will entitle him to recover ; but if you cannot find these propositions in his favor, then there will be an end to his case, and your verdict will be in favor of the defendants. Before, however, the plaintiff can recover, the case must be free from a fraud in fact.

" A fraud in fact arises where the parties to a transaction, by any scheme, device or contrivance, so use and hold property with intent to hinder, delay or defraud the creditors; and if this intent exist on the part of the vendor and is known to the vendee, a full and honest consideration will not protect the sale from taint of fraud in fact. What is meant by this rule as applied to this case is this : That if Berkenstock informed Mr. Kramer that he desired to make a sale of the property in dispute, for the reason that he was afraid that his creditors would seize it and sell it, then the sale would be a fraud. If such were the intent of Berkenstock and Kramer had a knowledge of it from any source, the payment of a full price will not protect the sale from a fraud in fact. Whether there was any such fraudulent intent is a fact to be found by you from all the testimony. The proof to establish a fraud should be clear and satisfactory, being sufficiently strong to produce an honest conviction.

" A fraud in fact would also exist if it were understood, or if it were agreed upon between Berkenstock and Kramer, that the $500 note was not to be paid by the plaintiff, but that the property should still belong to Berkenstock. How this fact was you will say from all the testimony.

" [You will remember what is sworn to by Kramer and Berkenstock as to the honesty of the transaction : and although Berkenstock may have told other persons while he was driving the line that the line was his, Kramer can only be affected by it so far as he had knowledge of it, and it is for you to say that if he spoke of the team as his to others, whether he meant to say anything more than that he was the driver of the line.]

[Worman *v.* Kramer.]

" [I am asked to charge you that if the plaintiff gave his note, and it was not legally negotiated, then the plaintiff is not such a purchaser as will be protected.  I cannot so instruct you.  The negotiability or non-negotiability of the note has nothing to do with this case.  The note, I believe, was negotiable; it was drawn payable to the order of Berkenstock.]

" It is alleged that the Snyder mare was to become Berkenstock's as soon as he paid for her.  I say to you, that if this mare, or any other property, was in the possession of Berkenstock, or held with the understanding or agreement that it was to become Berkenstock's as soon as he would pay for it, then this would be a fraud; and if Mr. Kramer owned part of the property only, and so mixed it with the property of Berkenstock that it was so promiscuously used that the ownership of the one could not be distinguished from the ownership of the other, and it was done with a fraudulent intent to hinder, delay or defraud creditors, then this alleged sale would be void, and the property would be liable for the executions of the defendants.

" Again—if this sale were made by Berkenstock to Kramer for the purpose of avoiding the penalty of the contract, which Berkenstock had contracted with Hottenstine, prohibiting him to run an opposition line of omnibus, and if Kramer knew of this purpose, intent or motive, before or at the time he made this purchase, then he acted with a full knowledge of the intended fraud, and aided in its commission; and if a fraud has been actually so committed, then no title to this property passed to Kramer.  You will then generally inquire if a fraud in fact has been actually committed between Kramer and Berkenstock in any of the ways it is alleged by the defendants to have been committed; and if by clear and satisfactory proof you are convinced there has been committed actual fraud, or a fraud in fact, then in law Kramer could acquire no title to the property, not even if he paid full value for the same, but the title still remained in Berkenstock so far as the creditors are concerned, and for their debts it was liable to seizure and sale by execution; and in that event your verdict will be generally for the defendants.  Your verdict will also be for the defendants if you find there was no transfer of the possession to Kramer as indicated in the first part of the charge; or if Berkenstock retained a concurrent possession as part owner.  If none of the defences as alleged by the defendants are sustained, then your verdict will be in favor of the plaintiff.

" The damages to which the plaintiff is entitled are the value of the property at the time of its seizure.  You are at liberty to find, if you are so satisfied, that only a portion of the property belonged to plaintiff.  [It is contended, as regards the mare purchased from Snyder, that title was never in Berkenstock, and as to this the plaintiff must certainly recover.  This, however, is a question of

[Worman *v.* Kramer.]

fact for you, and in the event you find for the plaintiff you will say whether it is for a whole, or only part.] That a portion of the property remained unsold, and was returned to the place from which it was taken at the time of seizure, is not a fact to be re-ceived even in mitigation of damages. The plaintiff was not bound to receive back any of the property taken, and if he had done so then the fact would go in mitigation of damages. In assessing the damages, you will inquire as to the fair market value at the time of seizure, and when that is ascertained the plaintiff will be entitled to interest on that amount from the time of seizure to this date."

The verdict was for the plaintiff for $739.12.

The defendants took out a writ of error and assigned for error the refusal to answer their points specifically and the parts of the charge in brackets.

*J. S. Biery* and *C. D. Erdman,* for plaintiffs in error.—Retained possession, without visible change, is fraudulent in law and void: Clow *v.* Woods, 5 S. & R. 275; Babb *v.* Clemson, 10 Id. 419; Carpenter *v.* Mayer, 5 Watts 485; Hamilton *v.* Russell, 1 Cranch 310; Milne *v.* Henry, 4 Wright 357; McKibbin *v.* Martin, 14 P. F. Smith 356. Legal fraud, where the facts are undisputed, or are ascertained, is for the court: Dornick *v.* Reichenback, 10 S. & R. 90; Dewart *v.* Clement, 12 Wright 414.

But, as the law in Pennsylvania is so well settled on these two points, it is perhaps more pertinent to the case at bar, to determine, if possible, what *indicia* of fraud are requisite to warrant the court in pronouncing a case fraudulent in law. " Retained posses-sion, without visible change," says Thompson, J., in Milne *v.* Henry, *supra,* " is fraudulent. There must be an actual separation of the property from the possession of the vendor at the time of the sale, or within a reasonable time afterward, according to the nature of the property: Billingsley *v.* White, 9 P. F. Smith 466; Chase *v.* Ralston, 6 Casey 541; Brawn *v.* Keller, 7 Wright 106; Hugus *v.* Robinson, 12 Harris 13.

*E. Harvey* and *J. D. Stiles,* for defendants in error.—When there has been a sufficient delivery, actual or constructive, and the vendor is in possession, the fact that the vendee is employed about the establishment in a capacity holding out no *indicia* of owner-ship, is not such a concurrent ownership as the law condemns, and the question is for the jury: McKibbin *v.* Martin, 14 P. F. Smith 352; Dunlap *v.* Bournonville, 2 Casey 72; McVicker *v.* May, 3 Barr 224. Separation of the property from the vendor's possession means only a change of his relation to it as owner, and consists in the surrender and transfer of his power and control over it to the vendee: Billingsley *v.* White and another, 9 P. F. Smith 464. There being evidence of a change of possession, the bona fides was

[Worman v. Kramer.]

for the jury: Craver v. Miller, 15 P. F. Smith 456. The possession of the servant is the possession of the master: Ward v. McCawley, 4 T. R. 490. It is not the place the property occupies that gives color of possession to the vendor; but the connection the *place* has with the vendor: Barr v. Reitz, 3 P. F. Smith 256. The action being trespass *de bonis asportatis*, our remedy was complete after the seizure and asportation of the property: Erisman v. Walter, 2 Casey 467; Waldron v. Haupt, 2 P. F. Smith 408; Berry v. Vantries, 12 S. & R. 93; Miller v. Baker, 1 Met. 27; Thomas v. Snyder, 11 Harris 515; Gibbs v. Chase, 10 Mass. R. 128; Hoofsmith v. Cope, 6 Wharton 53.

The opinion of the court was delivered, May 17th 1873, by

AGNEW, J.—This case was tried below on the grounds of fraud in law and fraud in fact, and in the argument the facts bearing on each branch have been somewhat blended. Fraud in law in this case, had relation to a retained, or a concurrent possession, and not to the intent to hinder and delay creditors, which enters into the question of fraud in fact. It is only by separating the evidence bearing distinctly upon each ground, that we can judge properly of the correctness of the judge's charge. Looking at his charge in this light, we do not discover any good reason to complain of it, except in two respects, which shall be noticed.

On the question of fraud in law, one fact of importance must not be overlooked, to wit, that the actual possession of the property appears to have been in the bailee of Kramer. The coach and horses were kept at Keim and Einstein's livery stable, and on the day of the sale to Kramer he bargained with Einstein to keep the coach, and the horses at hay, at $1.50 per week. In Linton v. Butz, 7 Barr 89, it was held that a sale of personal property in the hands of a bailee is good against an execution-creditor, though there be no actual delivery, if the vendor do not retake the possession. We cannot say, therefore, that there was error in that part of the charge set out in the first assignment of error; read as it must be, with the sentences immediately preceding and succeeding, in which it was left to the jury to say whether there had been an open, visible and notorious transfer of the possession. The mere employment of Berkenstock afterwards as a driver, would not, in itself, stamp the character of a legal fraud upon the sale, if the property was really kept by a third party, as bailee of Kramer, in an open and notorious manner. The facts were for the jury, as to how the coach and horses were kept, and for whom; and whether Berkenstock returned into such an immediate and visible possession, as deprived the transaction of that open and notorious character, which would fairly indicate to the public an actual transfer of the possession at the time of the sale, and following it.

23 P. F. SMITH—25

[Worman *v.* Kramer.]

The evidence in this case did raise a serious question as to the openness and the visible character of the possession. The intimate relations Berkenstock sustained to the property, after the sale, raised a question of fact, whether his possession was not, at least, concurrent with that of Kramer, and the defendants were, therefore, entitled to full and clear instructions on that point. In this part of the case the learned judge fell into an error, by his qualification of the instruction, that a concurrent possession exists only where the person in actual possession of the property has some interest in it as a part owner. There was no question as to a part ownership, either as tenants in common or as partners. The sale was out and out, and the question was only upon the possession. The defendants alleged that the possession of the coach and horses was, at least mixed or concurrent between Kramer and Berkenstock, and if so, it was insufficient to indicate an open and complete transfer of the possession, and in this view they were entitled to an answer which would not mislead. The concurrent possession alleged, was such as that spoken of by Judge Strong in Brawn *v.* Keller, 7 Wright 104, where the control and use of the property by the vendor and vendee, were so confused and mixed, as to leave the question of possession uncertain. If that were the kind here, the defendants were entitled to an instruction that the transfer of possession was not such as to protect the sale, no matter how honest and fair. But when the judge defined a concurrent possession to be one only where there is a part ownership of the property, he narrowed the instruction to the prejudice of the defendants. There was no evidence of a tenancy, either joint or in common, and the jury were, therefore, led away from what was meant by a concurrent possession; that is to say, a mixed or uncertain possession, apparently as much in one as in the other.

We think he erred, also, in refusing to give the defendants any benefit from the offered return of the brown horse, bought by Kramer of Snyder. If, as the evidence tended to show, the constable, after he found he had made a mistake in levying on the horse, as the property of Berkenstock, offered to return him to Kramer, who refused to take him, and the former then returned him to the stable, whence he took him, with notice to, or the knowledge of Kramer, it went in mitigation of damages. It might not atone for the trespass, in the taking, but if the horse were offered back, in as good plight as when taken, and in a reasonable time, clearly it was the duty of Kramer to receive him, unless he could show a good reason for not doing so. For these reasons the judgment is reversed, and a *venire facias de novo* is awarded.